**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISRICT OF COLUMBIA**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> 100 F Street, NE, <br> Washington, DC 20549 <br><br> Plaintiff, <br><br> v. <br><br> MINERCO, INC., BOBBY SHUMAKE JAPHIA, and JULIUS MAKIRI JENGE, <br><br> Defendants. | Case No. 1:24-cv-2870 <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

### SUMMARY

1.    The Commission brings this action against Minerco, Inc. (formerly trading on the OTC Pink market under the symbol "MINE") ("Minerco"), Bobby Shumake Japhia f/k/a Robert Samuel Shumake, Jr. ("Shumake"), and Julius Makiri Jenge ("Jenge") (collectively "Defendants"), for their roles in a pump-and-dump scheme that defrauded investors of approximately $8 million dollars.  Defendants benefitted from their fraud through an entity Shumake controlled that received millions in ill-gotten proceeds from Minerco stock sales, which it distributed in part to Shumake and Jenge.  The scheme ran from October 2019 through May 2021 (the "Relevant Period").

2.    The scheme had three essential parts.  First, Shumake used personal friends as nominal actors, or "nominees," to gain secret control of a large stock position in Minerco, an

1

inactive company whose stock traded at a low price on the OTC Pink Market.  He used these nominees, a then-friend ("Person A") and a shell company called Jameson Holdings LLC ("Jameson"), to obtain a note convertible into Minerco stock.  Through these nominees, Shumake had the note converted into one billion newly issued shares of Minerco stock, which constituted approximately ten percent of the company's then-reported shares outstanding. Shumake then arranged for Person A and Jameson to transfer the shares to an offshore company, Company A.  Shumake also arranged for a third nominee, Jenge, to assume control of Minerco using a shell company, CBD Acquisitions, LLC, which Jenge formed for that purpose.

3.      Second, having acquired a large position in Minerco and control over the company, Defendants "pumped" Minerco's stock price by attracting public attention around its allegedly becoming the "first publicly traded company focused on the research, production and distribution of psilocybin mushrooms."  They accomplished this in part by issuing public statements containing false and misleading information.  For example, Shumake and Minerco issued press releases stating that Minerco had partnered with a Jamaican company that would lend expertise in growing a unique strain of psilocybin and bequeath to Minerco its Jamaican cannabis licenses, and had been valued at $1 billion by an independent third party.  Minerco and Jenge also made false public disclosures, including claiming that Minerco was an active Nevada company when its charter had been revoked.  Minerco also told investors that it was poised to form a relationship with the University of Michigan to research psilocybin, something of which the University had no knowledge.

4.      Defendants also schemed to promote Minerco to the investing public by making numerous announcements suggesting that Minerco was a vibrant, growing business.  For

example, Minerco proclaimed a celebrity endorsement and announced that it would sponsor a

concert that could sell one million tickets.

5.     Finally, Shumake engaged Company A to "dump" the Minerco shares into the

market that Defendants had "pumped" through their promotional and false statements.

Ultimately, Company A transferred at least $3.4 million of the proceeds back to an entity

Shumake controlled, Shubox LLC ("Shubox").  Shubox used these funds to pay Shumake and

Jenge, and to defray the costs of the scheme.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and

22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)]

and Sections 21(d), 21(e), and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act")

[15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

7.     Defendants have, directly or indirectly, made use of the means or

instrumentalities of interstate commerce and of the mails in connection with the acts, practices,

and courses of business alleged in this complaint.

8.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa] because certain of

the acts, practices, and courses of conduct constituting violations of the federal securities laws

occurred within this district.  Investors residing in this district purchased Minerco stock at

inflated prices and sold them at a loss due to the manipulation of Minerco's stock price.

## THE DEFENDANTS

9.     **Minerco, Inc.** was a Nevada corporation.  On September 20, 2023, its registered

agent resigned and has not been replaced.  Its charter in Nevada has been revoked, and its last

annual report with the state was due June 30, 2022, but has not been filed.  Minerco does not currently have a class of shares registered with the Commission, but it did have a class of securities registered under Exchange Act Section 12(g) until July 6, 2017, when it filed a Form 15 to terminate its registration.  Minerco's common stock was quoted and traded over the counter in the U.S., on the OTC Markets Group Pink Open Market, under the symbol MINE.  On May 26, 2021, the Commission issued an Order of Suspension of Trading pursuant to Section 12(k) of the Exchange Act in the securities of Minerco, Inc. for a period of ten days commencing on May 27, 2021, citing, among other things, "questions and concerns regarding the adequacy and accuracy of information about the Company in the marketplace."  SEC Release No. 92027 (May 26, 2021).  Following the suspension, Minerco stock resumed trading on the OTC Expert Market until July 22, 2024, when its symbol was deleted following the suspension of the stock's Committee on Uniform Security Identification Procedures ("CUSIP") number.

10.     **Bobby Shumake Japhia, f/k/a Robert Samuel Shumake, Jr.**, age 56, is a resident of Dallas, Texas and Michigan.  In December 2017, Shumake pled guilty to two misdemeanor violations of the Michigan Credit Services Protection Act.  *See People v. Shumake*, No. 2017-261752-FH (Mich. 46th Jud. Dist. Feb. 15, 2017).  On September 20, 2021, the Commission filed a complaint against Shumake for securities fraud, which is presently in litigation.  *See SEC v. Shumake,* No. 2:21-cv-12193 (E.D. Mich.).  On April 10, 2023, Shumake changed his legal name to Bobby Shumake Japhia.  On February 7, 2024, Shumake filed for bankruptcy.  *See In re Bobby Japhia*, No. 9:24-bk-10129 (Bankr. C.D. Cal.).

11.     **Julius Makiri Jenge**, age 54, currently resides in Maryland.  On November 30, 2021, the SEC filed a subpoena enforcement action against Jenge.  *See SEC v. Jenge*, No. 1:21-mc-149 (TSC) (D.D.C.).  On August 12, 2024, the court ordered Jenge to comply with the

subpoena.  On August 23, 2024, Jenge was arrested as he prepared to depart on a flight to Tanzania.  In a criminal complaint unsealed that day, Jenge was charged with criminal securities fraud in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  *See United States v. Jenge*, No. 1:24-mj-00267 (MAU) (D.D.C.).  On September 8, 2024, Jenge asserted his Fifth Amendment privilege against self-incrimination in response to the SEC subpoena for his testimony, and the SEC dismissed the subpoena enforcement action.

### OTHER RELEVANT ENTITIES

12.     **Shubox LLC** is a Michigan limited liability company.  Shumake is its sole member.  Shubox owned three bank accounts and a crypto asset account that received Minerco stock sale proceeds.  Shumake was an authorized signer on each account.

13.     **Company A** is a limited liability company organized under the laws of the government of Dubai, United Arab Emirates, on March 1, 2020, with a principal place of business in Dubai.  Company A's formation documents do not list stock trading, speculation, or investment among its corporate purposes; instead, the company's listed purposes include electronic and computer repair businesses such as "Cookers & Cookstove Trading," "Refrigerators, Washing Machines & Household Electrical Appliances [Trading]," "Watches & Clocks & Spare Parts Trading," and "Photographic Equipment & Accessories Trading." Company A's corporate charter states specifically that it "may not engage in . . . investment of funds for the account of others."

14.     **Jameson Holdings LLC** ("Jameson") was, during the Relevant Period, a Virginia limited liability company formed on March 23, 2020, listing Person A as its manager and Jenge as its registered agent.

15.    **CBD Acquisitions, LLC** ("CBD Acquisitions") is a Georgia limited liability company organized on October 31, 2019, by "Julius Makari," who, upon information and belief, was Defendant Jenge.  In late October 2019, Minerco acquired a company called "CBD *Securities* Acquisition LLC" (emphasis added) for 2,000,000 preferred Class A shares of Minerco.  Through this transaction, CBD *Securities* Acquisition LLC assumed a control position in Minerco, and Jenge became Minerco's CEO.  When the transaction took place, CBD *Securities* Acquisition LLC did not exist.  Afterwards, Jenge formed "CBD Acquisitions" as a Georgia company, dropping "Securities" from the company name.

## BACKGROUND

### "Pump-and-Dump" Schemes Generally

16.    "Pump-and-dump" schemes typically target a company that has negligible assets, revenue, or current operations, but whose stock trades on a public market.  As a first step in the fraud, the perpetrators surreptitiously obtain control over a substantial portion of the shares of the company's stock.  If the targeted company is inactive at the time and its stock is thinly traded and offered at a very low price, then the perpetrators may cheaply obtain a large position in the stock.  After obtaining the publicly traded shares, the perpetrators "pump up" the stock price, typically by disseminating press releases or other information touting the company's financial condition or prospects.  That false appearance of economic activity and success encourages others to purchase the stock, which increases its price and volume.  Finally, the perpetrators "dump" their shares, meaning they sell to unsuspecting investors the shares that they own and control.  The dumping often occurs concurrent with or soon after the dissemination of promotional materials touting the company.  The perpetrators of a pump-and-dump scheme often

deposit or transfer their shares into different accounts, including nominees' accounts, to conceal the fact that they are both promoting and selling the stock.

### Defendants' Roles in the Scheme

17.     Jenge was the public face of Minerco.  He was Minerco's CEO and sole director. During the Relevant Period, Jenge uploaded and signed Minerco's Disclosure Statements Pursuant to the Pink Basic Disclosure Guidelines ("OTC Markets Disclosure Statements") identifying himself as Minerco's CEO, CFO, and Principal Financial Officer.  Minerco's press releases purported to quote Jenge, and he conducted shareholder meetings.  Jenge was aware that he was publicly held out as Minerco's CEO and quoted in its press releases, and he allowed Shumake to act and make statements in Jenge's name on Minerco's behalf.

18.     While Jenge was the public face of Minerco, Shumake acted behind the scenes as Minerco's *de facto* control person.  Shumake handled communications with third parties including Minerco's public relations consultant, its potential joint venture partners, and its lawyer.  Shumake drafted press releases and even drafted Jenge's quotes.  He also funded various Minerco operations, using his credit card to pay for Minerco's website domain (www.minercoinc.com) and to issue many of its press releases.  Shubox, an entity that Shumake controlled, made payments for Minerco to Minerco's transfer agent, OTC Markets, and Minerco's investor relations firm.  Shumake's phone number was the listed contact for Minerco's Twitter (now X) account, and Shumake was the listed contact for Minerco's website domain.

19.     Although Minerco's press releases, public statements, and investor calls did not identify Shumake, he posted about the company anonymously on an investor message board using the handle "Burntcheeze," using the forum to draw attention to Minerco's stock.

**FACTS**

**Part One:  Acquiring the Shares**

20.     During the Relevant Period, Minerco, as a microcap issuer, traded publicly on the OTC Pink market under the symbol "MINE."  On October 30, 2019 – just as Defendants' scheme was beginning – Minerco's closing stock price was $0.000001.  Minerco's business was in tatters:  its October 31, 2019, quarterly report noted a "Going Concern" warning, and showed an accumulated deficit of more than $37 million and a net loss of more than $100,000.  Indeed, Minerco was not even legally authorized to operate, as it had failed to file its annual report with Nevada, its state of incorporation, which had been due on June 30, 2019.

**A.     Shumake Gains Control of a Sizeable Position in Minerco Stock**

21.     In the fall of 2019, Shumake initiated a scheme to gain control over one billion shares of Minerco stock while using nominee individuals and corporations to mask his involvement.

22.     In approximately October 2019, Shumake presented his then-friend, Person A, with ownership of a company called Jameson – although, at the time, Jameson was a fictitious entity that had not been legally formed.

23.     Also in October 2019, one of Minerco's creditors assigned to Jameson a $50,000 interest in a Convertible Promissory Note that the creditor held.  Critically, the Note was convertible into Minerco stock.

24.     Following Shumake's instructions, Person A accepted the assignment on behalf of Jameson.

**B.      CBD Acquisitions and Jenge Assume Control of Minerco**

25.      In October and November 2019, Jenge assumed control of Minerco and became its CEO.  The change in control took place as follows.

26.      On October 30, 2019, Minerco caused 2,000,000 restricted Class A Preferred shares of Minerco stock to be issued to CBD Securities Acquisition, pursuant to a Purchase and Sale Agreement through which Minerco acquired CBD Securities Acquisition in return for issuing to it stock that carried an outsized share of votes.  Minerco's then-CEO requested the issuance and copied Shumake on his request.  At the time of this transaction, CBD Securities Acquisition did not exist.  The next day, Jenge, using the name "Julius Makiri," organized CBD Acquisitions, LLC as a Georgia corporation, dropping "Securities" from the company name.

27.      On November 12, 2019, Minerco updated its website, listing CBD Acquisitions as the registrant for the company's domain (www.minercoinc.com).

28.      Six weeks later, on January 7, 2020, in a board of directors resolution signed by Jenge, Minerco acknowledged the Note assignment to Jameson and agreed to Jameson's conversion of its $50,000 interest into one billion shares of Minerco stock.  That same day, Jenge signed a letter as Minerco's CEO directing the company's transfer agent to issue one billion shares of stock to Jameson.

29.      On February 26, 2020, Minerco issued one billion free-trading shares of its common stock to Jameson.  Jameson, however, still did not legally exist at the time.  The issuance of new common stock had a dilutive effect on Minerco's existing equity holders.

30.      Not until March 23, 2020, did Defendants form Jameson as a Virginia limited liability company, listing Jenge as its registered agent and Person A as the sole member.  Person

A was designated the sole member because Shumake did not want Jenge to be identified as the principal of both Minerco and Jameson.

**D.**    **Shumake Arranges for Jameson to Transfer its Minerco Shares to Company A, an Offshore Firm that Would Sell Them for a Fee**

31.    In September 2020, Shumake instructed Person A to sign an agreement in which Jameson would transfer its Minerco shares to Company A, a company of which Person A had never heard.

32.    Person A complied.  On September 16, 2020, Person A electronically signed a Stock Purchase Agreement with Company A, whereby Jameson sold its shares of unrestricted Minerco stock to Company A.  The agreement specified:  "The purchase price of the Stock shall be Thirty (30%) of the Net Sale Proceeds upon successful clearing of the shares."  In economic substance, the agreement meant that, in the upcoming "dump" into the market, Company A would distribute the shares into the market for a 30% fee.  On November 18, 2020, the transfer agent reissued the Minerco shares to Company A.

33.    On information and belief, after Jameson sold the Minerco stock to Company A, Shumake controlled and directed Company A's sales of the stock and received a portion of the sales proceeds through Shubox accounts.



Part Two:  The First Pump

A.    Defendants Set the Stage for the Pump During Their Minerco Takeover

34.    On November 20, 2019, amidst Defendants' maneuvering to give Shumake and his nominees control of Minerco, Shumake posted a link and remarked "Look what I found" on the Minerco InvestorsHub message board, using the anonymous handle "Burntcheeze."  By highlighting Minerco's website following CBD Acquisitions' takeover, and doing so on an investor forum dedicated to Minerco's stock as an investment prospect, Shumake shepherded investors to the website and began setting the stage for the upcoming pump.

35.    Similarly, on January 16, 2020, Minerco announced that a "specialized investment firm" had acquired Minerco.  Jenge approved the press release on Minerco's behalf. The press release identified the acquiror as a "psilocybin research and investment firm," and stated:  "The Company plans to immediately enter into the psilocybin 'Magic Mushrooms' market, targeting the multibillion-dollar space in the research and development of potential

psychiatric medicines, while relocating the Company's headquarters to Jamaica." Again, to attract investors' attention, Shumake posted a link to the press release on the InvestorsHub Minerco message board using his "Burntcheeze" handle. The press release was false: CBD Acquisitions, the only company to which the press release conceivably could have referred, was a recently formed shell company with no specialized investment experience.

**B.    Defendants Promote Minerco with Statements that Create the False Appearance of Economic Success and Vitality**

36.    Once Defendants had acquired control over the Minerco shares through Jameson, transferred those shares to Company A for future sale, installed Jenge as CEO of Minerco, and laid the groundwork for the pump, Defendants embarked on a media campaign to promote Minerco and increase its stock price.

37.    The first step was to make Minerco look like a real company. In an effort to project economic activity and growth, in the fall of 2019, Shumake retained on Minerco's behalf an advertising company to produce two articles, a social media campaign, a text message campaign, and email distributions. Shumake's company Shubox later sent a payment for those services.

38.    Similarly, in approximately December 2019, Minerco hired a public relations firm (the "PR Firm"). Shumake again was involved: He introduced the PR Firm's principal to the advertising firm to discuss Minerco. On behalf of Minerco, the PR Firm's principal hired a Canadian newswire service, which Minerco used to publish some of its press releases starting in 2020.

39.    Eventually, more than a year later on March 3, 2021, Minerco publicly announced that it had retained the PR Firm, but the announcement disguised the fact that its principal had a prior criminal conviction and SEC judgment against him: Instead of using the PR Firm

principal's real name, it used the alias "Bill Miller."  Shumake used his credit card to pay for the publication of the press release.  From March 1 to April 6, 2021, Shumake's company, Shubox, paid approximately $23,000 to the PR Firm through an affiliate.

40.     Defendants also made a series of false and misleading public statements, including press releases and disclosures, to boost Minerco's stock price.  From December 2020 through May 2021, Minerco issued approximately 20 press releases, or roughly one per week, at least half of which Shumake funded using his credit card.  Minerco also posted frequently on its website and Twitter (now X) account, and hosted multiple investor Zoom calls.  The volume of public statements, and, in some cases, their false and materially misleading content, created the false impression that Minerco was a vibrant and growing company that was successfully implementing its business plan.

### 1.     False and Misleading Statements About a Joint Venture

41.     In or around November 2020, Shumake sought advice from a Jamaican business-owner about how to develop operations in Jamaica.  This discussion resulted in a joint venture between the companies memorialized in a letter of intent ("LOI") dated December 20, 2020.  The LOI established that the parties intended to enter into negotiations for the Jamaican company to contribute to a collaborative project its provisional cannabis licenses and land for growing cannabis and mushrooms, in return for a strategic and financial contribution from Minerco.

42.     Almost immediately – and contrary to the express wishes of the Jamaican company – Minerco began making false statements about the new joint venture.  On or about January 3, 2021, Shumake told the Jamaican company that Minerco was going to issue a press release about the LOI, but the Jamaican company's representative told Shumake not to do so until he could review it.

43.     Shumake and Minerco ignored their joint venture partner's plea.  On January 4, 2021, Minerco issued a press release – paid for using Shumake's credit card – announcing a joint venture to grow, process, and extract psilocybin and cannabis for export to Canada and Europe. It falsely stated that the Jamaican company would "serve as psilocybin experts to grow and develop a unique strain of mushrooms specific to Jamaica," and that Minerco would "inherit" from the Jamaican company "multiple cannabis licenses to grow, process, extract cannabis." Neither was true:  The Jamaican company had not agreed to provide psilocybin expertise or to transfer its cannabis licenses to Minerco as part of the joint venture.  Indeed, the companies' LOI did not mention those things.

44.     The false statements had their intended effect.  On the day of the press release, Minerco's stock price rose more than 15 percent and its volume increased by more than 100 percent.

45.     Shortly following the press release, a representative of the Jamaican company asked Shumake to retract it, but Shumake said that he could not do so.

46.     The embryonic joint venture did not survive Defendants' false statements.  On February 20, 2021, the Jamaican company gave Minerco formal written notice immediately terminating the LOI.  Minerco acknowledged the joint venture's cancellation on a March 28, 2021, shareholder call, promising to update its website accordingly, but it failed to do so for weeks.  As late as May 2021, Minerco's website falsely claimed an existing partnership with the Jamaican company to grow cannabis and psilocybin and produce 1 million microdose psilocybin tablets per day.

> ### 2.    False and Misleading Statements About an Alleged Third-Party Valuation

47.    Minerco also made misleading statements suggesting that an independent "third party" had analyzed Minerco and valued it at $1 billion.  In fact, however, the valuation was merely Shumake's own assessment.

48.    In a press release dated December 28, 2020, Minerco announced that it had "hired" an online valuation tool (the "OVT"), to create a business valuation.  The press release stressed the third-party nature of the valuation, quoting Jenge as saying:  "It is significant to have a third party evaluate our business strategy to determine if we are on the right track for our shareholders.  This valuation will give definitive confidence as to the financial strength and viability of the psilocybin industry."

49.    Minerco and Shumake underscored the purportedly independent nature of the OVT's process by announcing an anticipated timeline for the OVT's efforts.  Minerco's press release explained that it "anticipate[d] the pre-money valuation and financial projections within 14 business days."  Shumake also discussed the OVT valuation process in posts on the InvestorsHub message board under his "Burntcheeze" alias, echoing the press release's statement that the "valuation report will be within 14 days."  On January 4, 2021, again posting as Burntcheeze, Shumake expressed his supposed continuing curiosity about the forthcoming results, ruminating:  "I'm waiting on the valuation. What could that look like."

50.    In reality, an OVT valuation is not an independent or third-party appraisal, and its results are nearly instantaneous – it is essentially a calculator, prompting the user to input data including historical revenues, projected revenues, and balance sheet figures in response to 37 questions, and then using embedded formulas to generate a business valuation in seconds.

51.     Given the OVT's nature, Minerco's and Shumake's statements that Minerco had "hired" the OVT to conduct a "third party" valuation company over "14 days" were a charade. Minerco hired the OVT to create a valuation only in the sense that a company hires Microsoft Excel to create a spreadsheet.  Shumake created the OVT account online on December 28, 2020, the day of Minerco's press release, and because he had immediate access to the software, he could have generated a result almost immediately.  Instead, to build anticipation while maintaining the illusion that there was an independent company with expert employees conducting a thorough analysis, Shumake waited 14 days to use the software to generate the valuation.  At no time was Shumake "waiting on the valuation"; he could have generated it whenever he chose.

52.     Nor was there any mystery to Shumake about "[w]hat that [result] could look like."  His ability to manipulate the OVT's inputs meant that he could essentially achieve whatever output valuation he desired.  Indeed, when Shumake finally used the OVT software to generate a report on January 14, 2021, he did so twice, using different inputs.

53.     Shumake's involvement in the valuation is clear.  Although the version of the report published online redacted Shumake's name from visibility, the report's cover page identified him as the contact person.

54.     Having self-generated a $1 billion valuation, on January 14, 2021, Minerco misleadingly posted on Twitter the message "Finally our [OVT] valuation is done," and included a graphic showing Minerco with a valuation over $1 billion.  Minerco posted a nearly identical Tweet on January 15, 2021, stating:  "Finally received our Valuation Report from [the OVT] Software. 14 Days later."  The tweets continued the misleading implication that Minerco had

waited 14 days to receive the OVT report when in fact it was generated instantly when Shumake chose.

55.     The OVT valuation charade paid dividends:  Minerco's stock price increased by approximately 18%, from at $0.0014 at the close on January 14, 2021, to $0.00165 on January 15, 2021.

56.     On the next trading day, January 19, 2021, Minerco repeated the false and misleading statements, issuing a press release and a Tweet claiming it had received a $1 billion valuation from OVT.  In it, a quote attributed to Jenge stated:  "This valuation will give definitive confidence as to the strength and viability of the psilocybin industry.  In addition, it gives confirmation that we are in the right industry with the right business at the right time."  Shumake paid for Minerco to publish the January 19 press release using his credit card.

57.     The valuation misstatements continued to pay:  Minerco's stock price closed up approximately 9%, from to $0.00165 on January 15 to $0.0018 on January 19, and the next day (January 20) it increased approximately 17%, to $0.0021, with an intraday high of $0.0025.

### 3.     False and Misleading Statements in OTC Markets Filings

58.     Defendants also made material misstatements in Minerco's public disclosures.  On or about January 7, February 1, March 11, and May 25, 2021, Minerco posted public financial disclosures ("Disclosure Statements") on the OTC Markets website pursuant to the OTC Pink Basic Disclosure Guidelines ("OTC Guidelines").  Jenge signed each of the Disclosure Statements as Minerco's CEO, CFO, and Principal Financial Officer, and he uploaded each from his personal Gmail account.  The Disclosure Statements were false and misleading as described below.

59.     First, the Disclosure Statements disclosed only Jenge as an officer, director, or control person of Minerco – they did not disclose Shumake's involvement or role.  The failure to state Shumake's involvement violated the OTC Guidelines with respect to at least the second two Disclosure Statements.  On March 1, 2021, OTC Markets updated the OTC Guidelines to make clear that the Disclosure Statements should identify as "Company Insiders" "any officer, and any director of the company, or any person that performs a similar function, regardless of the number of shares they own" – a capacious definition easily encompassing Shumake.  Jenge signed and uploaded the March 11 and May 25 Disclosure Statements, but each failed to list Shumake despite his controlling Minerco's operations at least to the extent that any officer or director typically would.

60.     The motive for omitting Shumake was clear:  He had a relevant criminal history. The OTC Guidelines called for disclosure of the "Legal/Disciplinary History" of "Company Insiders," including "whether any of the persons or entities listed above have, in the past 10 years, been the subject of:  A conviction in a criminal proceeding . . . (excluding traffic violations and other minor offenses)."  Shumake had misdemeanor criminal convictions, but by entirely withholding Shumake's name as a "Corporate Insider," Jenge and Minerco evaded the requirement to disclose them.

61.     Additionally, Minerco's 2021 Disclosure Statements falsely stated that it was an "[a]ctive" Nevada corporation.  To the contrary, the Nevada Secretary of State had revoked Minerco's corporate charter the previous summer (on July 1, 2020) for failing to pay fees and file its annual report.  Under Nevada law, the revocation terminated Minerco's right to transact business and required it to be treated as insolvent, with its assets held in trust by the company's directors.  Nev. Rev. Stat. § 78.175.  Consequently, Minerco's reports of an "[a]ctive" status

were false, and it had no corporate legal standing to engage in any of the activities and operations it purportedly carried out, including conducting business, entering into contracts, and pursuing a joint venture.

### D. Minerco's Scheme Successfully Boosted its Stock Price and Trading Volume

62. As they intended, Defendants' deceptive scheme and false statements successfully "pumped" Minerco's stock price and volume. On October 1, 2020, Minerco's stock closed at $ 0.000001 (1/10,000 of a penny). By February 10, 2021, however – merely four months later – Minerco's stock closed at $0.0127, a remarkable 1,269,900% increase despite its low absolute price. Trading volume likewise skyrocketed from approximately 22 million shares on October 1, 2020, to nearly 3 *billion* shares on February 10, 2021.

### Part Three:  The First Sale – Company A Liquidates More Than 600 Million Shares

63. Once Defendants caused Minerco's stock price and volume to spike through their deceptive scheme and statements, Company A began selling large quantities of stock. As described above, Shumake had instructed Person A to enter into an agreement that transferred Jameson's one billion shares of Minerco stock to Company A, and that transfer occurred on September 16, 2020. At the time, Minerco's stock was worth about $0.000075 per share. On October 1, 2020, Company A opened an account at an offshore bank in the Bahamas. By December 18, 2020, Company A had arranged for the transfer agent to reissue the one billion shares into the Bahamian bank's name. The Bahamian bank held omnibus accounts at U.S. broker-dealers.

64. On February 10, 2021, after the stock price had spiked, Company A rapidly sold many of these Minerco shares into the market. Company A's representative gave trading instructions to the Bahamian bank, which sold the stock through its New York brokerage on Company A's behalf. In a single day – February 10, 2021 – Company A sold about 255 million

shares for gross proceeds of about $2.95 million.  Between February 10 and February 17, Company A sold more than 600 million shares of Minerco stock (approximately 9% of its total trading volume) for proceeds of approximately $7 million.

### Part Four:  The Second Pump

65.     Heavy selling tends to drive down the price of a stock, but a pause in selling and a series of positive statements and promotional efforts sometimes can stabilize the stock price and lead to greater ultimate gains from future sales.  In that vein, during a pause in Company A's sales of Minerco stock, Defendants issued additional public statements including false statements, all with the intention of further boosting Minerco's stock price and volume.

**A.      Minerco Announces Affiliation with a Famous Rapper**

66.     On February 27, 2021, Minerco issued a press release announcing that it had named a well-known rapper as an "ambassador" to "raise awareness on the company's overall mission to educate the masses on botanical products such as cannabis or psilocybin."  Shumake paid to publish this press release with his credit card.

**B.      Minerco Announces an Imminent or Actual Relationship with University of Michigan**

67.     On March 28, 2021, during a Minerco-hosted investor conference call, Minerco's representative announced that "we have entered into a relationship, or are about to enter into a relationship, with the University of Michigan for the testing of magic mushrooms for medicinal purposes, in particular, depression, insomnia, and other . . . unmet needs that we are currently studying."  However, no such relationship existed.

**C.      Minerco Announces that It Will Sponsor a Massive Concert**

68.     On April 19 and again on May 13, 2021, Minerco announced that it was sponsoring a livestreamed concert with ticket sales projected to exceed one million worldwide.

69.     On April 13, 2021, Jenge signed a contract to produce the concert.  Shubox wired the $237,500 appearance fee (of contract price of $475,000) from its bank account, for which Shumake was an authorized signer.  This same bank account received proceeds from Company A's sales of Minerco stock, including a wire receipt the previous day for approximately $500,000.

70.     On May 5, 2021, Shubox provided a deposit for a private rental of a concert hall in Detroit as the venue for the concert, but Defendants had no intention to stage the actual event; Minerco never signed a rental agreement, nor did it make preparations with the venue to stage the concert.  Shumake and Shumake's local agent were the only people who spoke with the concert hall about the rental.  On May 17, the venue officially canceled the concert and forfeited Minerco's deposit.  The live concert never happened.

### Part Five:  The Second Sale – Company A Sells 325 Million Additional Shares

71.     Between April 20 and May 26, 2021, Company A resumed selling Minerco stock and sold approximately 325.5 million additional shares for gross proceeds of about $1.3 million.

72.     In total, between the first and second phases of selling, Company A sold about 928 million of the one billion shares that it had received for sale pursuant to its contract with Jameson, for proceeds of about $8.4 million.



**Defendants Circulate the Fraud Proceeds to Shumake**

73.    Just after the final round of selling, Company A transferred approximately $7 million of the fraud proceeds first to its bank account in the Bahamas, and then to accounts at a US and Canadian digital assets fintech company, which converted the funds into crypto assets including Tether (USDT) and Bitcoin (BTC).  Those accounts then transferred the majority of the crypto assets to other accounts at the fintech company and two cryptocurrency exchanges.

74.    Shumake's Shubox account at the fintech company received approximately 16.236 BTC and 2.566 million USDT, excluding fees, which accounted for approximately $3.4 million of the Minerco stock sale proceeds.

75.    Shubox then transferred approximately $2.7 million of the $3.4 million in ill-gotten gains to U.S. bank accounts in the name of Shubox LLC.  As explained above, Shumake is the sole member of Shubox and an authorized signer on each of the company's bank accounts.

76.     Shumake used the money in the Shubox accounts to fund personal expenditures including payments to a car dealership, jewelry stores, grocery stores, and restaurants.  He also paid approximately $26,000 to Jenge; $23,000 to the PR Firm's affiliate; $237,500 to the concert talent agency; and additional amounts to Minerco's transfer agent, lawyers, accountants, and others who did work for Minerco.

77.     During the Relevant Period, Defendants' pump-and-dump scheme inflicted pecuniary harm on investors who traded Minerco shares.  Investors who bought Minerco stock in reliance on the public announcements that were either misleading or false, or that created a false appearance of fact, were duped.  They paid a higher price than the shares were worth, and they suffered losses when they tried to sell their shares.  Moreover, Minerco's issuance of one billion additional shares diluted existing stockholders' equity.

**Attempt to Destroy Evidence**

78.     On October 1, 2021, SEC staff issued a subpoena to Jenge for documents and testimony in the investigation that gave rise to this action.  That same day, the staff emailed a copy of the subpoena package to Jenge's Minerco business email address.  UPS delivered the subpoena to the garage of Jenge's then-residence in Norfolk, Virginia on Monday, October 4, 2021, at 9:18 a.m.  The day after the SEC subpoena arrived, Shumake requested that Minerco's email service provider remove seven email boxes in the Minerco domain, including the email boxes for "Robert"; "miners"; "Julius"; and "ceo."  These efforts to destroy evidence in the wake of Jenge's receiving the subpoena are strong evidence of scienter and consciousness of wrongdoing.

## COUNT ONE

**False Statement or Misleading Omission in the Purchase or Sale of Securities**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b)]**
**(Against Minerco, Shumake and Jenge)**

79.     Paragraphs 1 through 78 are realleged and incorporated by reference as though fully set forth herein.

80.     Section 10(b) of the Exchange Act provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

81.     Rule 10b-5(b) provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

82.     By reason of the foregoing, including *but not limited to* Paragraphs 7, 8, 35, 41-61, 67, 73-78, Shumake, Jenge, and Minerco violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5].

## COUNT TWO

**Scheme to Defraud in the Purchase or Sale of Securities**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) thereunder**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a) & (c)]**
**(Against Minerco, Shumake, and Jenge)**

83.     Paragraphs 1 through 78 are realleged and incorporated by reference as though fully set forth herein.

84.     Section 10(b) of the Exchange Act provides that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

85.     Rule 10b-5(a) and (c) provide that it shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, to employ any device, scheme, or artifice to defraud (Rule 10b-5(a)), or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security (Rule 10b-5(c)).

86.     By reason of the foregoing, *including but not limited to* Paragraphs 7, 8, 16-34, 36-40, 62-66, 68-78, Shumake, Jenge, and Minerco, violated, and unless restrained and enjoined

will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. §24010b-5(a) and (c)].

## COUNT THREE

**Obtaining Money or Property by Means of False Statement or Misleading Omission in the Offer or Sale of Securities**
**Violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]**
**(Against Minerco, Shumake, and Jenge)**

87.     Paragraphs 1 through 78 are realleged are re-alleged and incorporated by reference.

88.     Section 17(a)(2) of the Securities Act provides that it shall be unlawful for any person in the offer in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, directly or indirectly to obtain money or property by means of untrue statements of material fact or by omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

89.     By reason of the foregoing, including *but not limited to* the allegations in paragraphs 7, 8, 35, 41-61, 67, 73-78, Defendants Minerco, Shumake, and Jenge violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## COUNT FOUR

**Scheme to Defraud in the Offer or Sale of Securities**
**Violations of Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) & (3)]**
**(Against Minerco, Shumake, and Jenge)**

90.     Paragraphs 1 through 78 are re-alleged and incorporated by reference.

91.     Section 17(a)(1) and (3) of the Securities Act provides that it shall be unlawful for any person in the offer in the offer and sale of securities, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, directly or indirectly:

to employ any device, scheme or artifice to defraud (Section 17(a)(1)), or to engage in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchasers of such securities (Section 17(a)(3)).

92.     By reason of the foregoing, including *but not limited to* the allegations in paragraphs 7, 8, 16-34, 36-40, 62-66, 68-78, Minerco, Shumake, and Jenge violated Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. §77q(a)(1) and (3)].

93.     prevent unjust enrichment, such proceeds should be disgorged.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

1.     Finding that the Defendants committed the securities law violations alleged in this Complaint;

2.     In forms consistent with Rule 65 (d) of the Federal Rules of Civil Procedure, permanently enjoining the Defendants from violating Sections 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Exchange Act Rule 10b-5 [15 U.S.C. § 77q(a), 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5];

3.     In forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, prohibiting Shumake and Jenge, pursuant to Section 20(g)(1) of the Securities Act [15 U.S.C. § 77t(g)(1)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)], from participating in any offering of penny stock;

4.     In forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, prohibiting Shumake and Jenge, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C.§78u(d)(2)], from serving as an officer or director of any issuer that has a class of

securities registered pursuant to Section 12 [15 U.S.C. § 78l] of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §78o(d)];

5.      In forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Shumake and Jenge from directly or indirectly, including, but not limited to, through any entity owned or controlled by either of them, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent either of them from purchasing or selling securities listed on a national securities exchange for his own personal account;

6.      Ordering that Defendants disgorge any and all ill-gotten gains, together with pre-judgment and post-judgment interest, derived from the securities law violations set forth in this Complaint pursuant to Section 21(d)(3), (d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

7.      Imposing civil monetary penalties against Defendants for each of their securities law violations, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

8.      Granting such other relief as this Court may deem just or appropriate.

## VIII.   JURY DEMAND

The SEC demands a jury in this matter.

Dated: October 9, 2024

Respectfully submitted,

/s/ Damon W. Taaffe
Damon W. Taaffe (D.C. Bar No. 483874)
Trial Counsel
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Tel: (202) 551-7420
taaffed@sec.gov